BOURNETT v. LOYD TOOKS May it please the Court, my name is Lloyd Tooks. Mr. Burnett petitions this Court to set aside his removal after 19 years of employment as a forensic chemist with the DEA because that removal was number one, obtained without procedures required by law, contrary to applicable law. What was the illegal procedure? The illegal procedure was removing him without giving him a reasonable opportunity to improve. The core of our argument is this 10% technical error rate. He got a 73 day PIP and a 65 day PIP, right? No, just a 73 day PIP. The PIP was initially 60 days. They extended it to 73. No, wait a minute. There seem to be two parts to your answer. Are you saying that holding him to the 10% was unlawful or that they didn't give him a sufficient period in which to regroup after his performance had been found deficient? I'm saying holding him to 10% over 73 days was unreasonable. The 10%, the core fact in our appeal is this, the 10% technical error rate was applicable over 12 months. It was a full year. So are you saying that if people are held to a certain percentage of anything across the board in the federal government, if they get a PIP, it has to be for a year for the entire evaluation period? It can't be for a shorter period? I'm not saying that. If the performance standard had said 10% per month or 10% per six months, that's fine. But the performance standard did not say that. What did the performance standard say on average? No, it did not. No, it did not. So what did it say? Specifically, and this is what the supervisor said, the standard is, quote, no more than 10% of submitted worksheets contain errors. There is no time period explicitly associated with that. However, the evidence... What are you saying? That you have to take, you take the average for the year? No. You can't take it on a monthly basis? I'm saying based on the evidence in the record, it was a yearly standard. That evidence including, number one, the initial articulation to Mr. Burnett of the 10% standard was an articulation setting forth FY 2009, fiscal year 2009 performance standard. That was in the standard. Secondly, I submitted, or there is a submission of a number of Mr. Burnett's co-workers who failed to achieve 10% in a month, or two months, or three months. Nothing happened to them, and when I inquired in interrogatories, why weren't these people placed on PIPs or given unacceptable ratings, the response was, they improved such that overall for the entire year, their percentage rate was 10%. So I guess, going back to my question, which maybe I wasn't clear on, is it your view, since there's a 10% rate, that it has to be on an annual basis, and therefore a PIP for any period shorter than a full year would not be adequate, would be unlawful? No, that's not my view. My view again is that, as applied in this case, 10% was applicable for the entire year. The evidence shows that. I would respectfully submit. Secondly, and therefore, what is the agency therefore limited to in terms of a time frame for a PIP? Okay, with respect to a PIP then, the agency should have, and could have, prorated the 10% in some way, shape, or form. Now again, this is not my standard, or Mr. Burnett's standard. How would they do that? Well, they could say, if you're going to do it for 73 days, you're allowed 20%, or you're allowed 25%. I don't understand how that's prorating. If you have a 10% rate Here, the suggestion is this. It is much more, well, it was shown in the record that most of the chemists, including Mr. Burnett, started out receiving errors, such that in the early months, their error rate was higher. They were therefore permitted the entire 12 months to lower the rate and achieve this 10%. There is indicated in the record, at least three of Mr. Burnett's co-workers who hadn't achieved 10% after six months, and the only admonition to them from the supervisor was, get that rate down to 10% by the end of the year. So that's my only suggestion to you, your honor, as to how it might be prorated. But he was at 31% in his, he first got a 60-day PIP and then they extended it to 70 days, but he was at 31%. That's three times. That's three times an improper standard. What's improper? There's nothing improper about the standard under the law. The law does not require a one-year PIP. No, I agree with that. I'm talking about prorating. The law does require that you cannot use a one-year standard for a 73-day PIP. It must be prorated. Even the MSPB acknowledged that. You don't have to give... Let's take 2009. He had, through six months, had a 27% error rate. In order to get that 27% down to 10%, he would have had to do twice as much work and only have a 1% error rate. That's the only way he could have made it to 10% in the following six months. He would have had to do twice as many and only had a 1% error rate. Did he ever perform at that standard? It is not my knowledge that he did. I don't think he did either. And what you're suggesting, if I may say so, your honor, is harmless error. He could never have made it. But a reasonable opportunity to improve is a substantive right not amenable to the harmless error analysis. Even if he was the worst performer in the world, he is still entitled to a reasonable opportunity to improve. What was unreasonable about the 73 days, in which he was three times the 10%? It's because the 10% wasn't prorated. There's nothing unreasonable... What do you mean prorated? Again, if you have a burden of achieving a 10% error rate over a year... Well, we already established that it wasn't a year. It was just a 10% error rate. Well, it has to be over a period of time. I'm suggesting to you, saying 10% without a firm benchmark. It is not something you know what you're going after. If you just say 10%, and this is what happened to him, I would admit to you, he's just told 10% over the year in the beginning. And then because he didn't perform well enough during the first months, it's 10% over the next three months. So let me ask you, I'm really getting more confused rather than that's probably my problem. But if you say you need a prorated, and if you say, let's assume it is an annual rate of 10%. So if he's got a PIP for three months, and he performs at a 90% error rate during those months, you're saying that you have to... How do you calculate it prorated over the year? You assume hypothetically that the other nine months of the year he would have had a 0% rate, and then that has to... I'm saying, if you're talking about the PIP and proration, and this is just, I'm attempting to... Well, I'm asking you, I think I started by asking you, are you suggesting that when you have a standard, let's assume, let's accept your idea that it has to, it's an annual standard. If you have an annual standard, then you can only have a PIP that lasts for that entire year. And I think your answer was no, you can prorate it. So I want to understand how, give me a hypothetical in this period. You can have a PIP for 60 days, but you don't prorate the period, you prorate the percentage rate. So what percentage would have been sufficient for him to have under the PIP period, however you're prorating it? I'm just trying to really see in the numbers how you're prorating it. Again, I don't have a firm articulation for you of a particular proration. Let me start by saying... But if he was going to, after 75 days, he had a 30% error rate. If he would have extended that through a year, he would have to be almost flawless for the rest of the year to get that down to 10%. Okay. My response to your honor is, if the percentage rate was improper, then he cannot be judged under that rate, whether he would have accomplished it or not. It's the articulation of the rate and saying, you must meet 10%. Well, what rate would have been proper then? If you're going to prorate it, what rate should they have held them to for that three-month period? I'm just trying to understand... One proration might be if it's 10% for a year. And again, the idea is people have a better opportunity to achieve 10% over 12 months than they do over two or three months. The more worksheets they submit and the more opportunity they have to get... Except that they gave him the easy marijuana cases. He had an easier route to achieve the 10% in the 70 days and he still was three times the rate. So they helped him and he still couldn't do the work. Under the law that I've read, your honor, that's not applicable. It is incredibly applicable. They are doing everything they can to help this individual achieve his success and he fails. All right. Let me move into, if you don't understand the error rate... I don't understand it. Then it's not a firm benchmark. Can you just give me... Maybe I'll understand it better. Can you come up with a number where you're saying they didn't prorate it and it should have been prorated? What number would you... And you're telling me, no, they could do a PIP for 90 days or 70 days. I'm saying they could. So what number would have been an appropriate one to evaluate someone for 70 days if, as you say, the annual rate was... The only thing I could do is break it down. 10% for a year, 20% for six months, and then break down, add maybe 25% for three months. I'm just speculating, but that would be what I would be talking about. Except that that doesn't work because then for the rest of the year you'd have to be perfect and no human being is. I'm just talking about the PIP here. Yeah, but your reasoning is illogical. I'm trying to figure out how we make a logic, Blake, logic out of your argument. The logical argument is, if you have to attain a certain percentage error rate in 12 months... That means out of 10 I can miss two. It depends upon how many cases I do, not a period of time. But the standard was a one-year standard. And he failed under that. In the full year of 2008, he was almost double. He was 20%, he was... 2009 he was almost three times. No, 2009 it was 20%. Well, I had him at 27 over the six-month period of 40 out of 146. 369 exhibits, 77 errors, 20.86%. And I'm sorry if I didn't respond to your question. But again, I'm not saying the period of time of the PIP should have been prorated. Absolutely not saying that. I'm just trying to prorate a standard that I didn't create and Mr. Burnett didn't create. If the standard is difficult of proration, that's on the agency. It's the agency's standard. Well, that's only the case, but that seems to me that you're saying the only solution here would be to give them a PIP that extended for the annual. The only thing that would satisfy you was a PIP that lasted for a full year. And you kind of said, no, that's not what you're saying. So you're saying they can do a PIP for 70 days. And prorate the percentage rate. Right. And the proration in your view under a rough calculation would be 25% error over that. I'm just throwing that out of speculation. It would be more than 10%. Let's put it that way. More than 10%. Well, the error rate during the period was more than 10% too. So you think it would be more, what was his error rate during the PIP period? 30%. So you're saying it has to be something, the prorated rate has to be above 30 or else they would have been justified in firing. No, I'm saying you can't use the harmless error rule. If you erred in this regard, you must reinstate that. So even if you're saying that the prorated rate should have been 25, and in fact, we look at the record and there's no dispute that his error rate for that PIP period was above even what you say should have been the prorated rate, you're saying we can't affirm the discharge? I'm suggesting that because a reasonable opportunity to improve is a substantive right and substantive rights are not analyzed under the harmless error rule. If this were subject to a harmless error rule, you could, but this is a substantive right. And as the MSPB has said, it is the most important substantive right, the reasonable opportunity to improve. Thank you, Mr. Cooks. You concerned your rebuttal time. Why don't we give you an extra minute on rebuttal and Ms. Vandeman can have an extra minute if she needs it. May it please the court. The standard is whether Mr. Burnett had a reasonable opportunity to improve and assistance in trying to improve. That's what regulation provides, that at any time during an appraisal period, the employing agency may place someone on a PIP, give the person a reasonable opportunity to improve and assistance. We establish in our brief that... By the way, can you help me out? What's the errors here? How do you make an error in this? You're measuring the composition and weight of chemical drugs. How do you make errors? Most of, many of Mr. Burnett's errors, which he repeated over the course of a couple years, including during the PIP work, was in weighing the substances. He either, and Ms. Chagy... Why isn't that pretty automatic? I mean, you put it on a scale and it weighs. Your Honor, there was a lot of evidence in the record and Ms. Chagy's declaration explains a lot of this as well. Mr. Burnett, for example, failed to describe what instrument he used, failed to record the weight of the instrument he used. Sometimes they take the substance, take some out to analyze it. You have to record how much you took out, what you're using, what kind of instrument. His reports, particularly on the weighing issue, were such that it was difficult, if not impossible, for any other forensic chemist to reconstruct what he had done. We gave some examples of some of the types of errors he made at page 10 of our brief, and Ms. Chagy's declaration goes into detail on that as well. But the weight is crucial because, as we explained, often the criminal penalties for a particular controlled substance depended on the weight, how much of the controlled substance a criminal defendant had. And this 10% rate, I must emphasize, was no more than a maximum 10% technical error rate on the first submission to the supervisor. Ms. Chagy reviewed Mr. Burnett's reports as well as all the other GS-12 forensic chemists, and the feedback that she gave in terms of her written evaluations of the errors that he made, some of which were multiple on any one particular lab report, showed that there was a tremendous amount of work in reviewing and pointing out to Mr. Burnett his errors, which again he continued to make. Did they discover these errors because people were routinely reviewing what he and others had done, or how did they come up with these? Yes. Because it is a little disturbing that these labs are off by 30% in some cases. Well, that's key, your honor. People are relying on that for criminal convictions. Well, what happened with the review procedure, which is the one reason why Ms. Chagy reviewed each and every report that was on first submission, was that to the maximum extent possible, no errors got through. Because with the review process, then someone else, either Mr. Burnett or someone else, was able to go back and redo the analysis, make sure that the technical analysis was correct, so that whatever reports were turned over to the prosecutors were correct. And contrary to his argument, the standard is not whether one of his reports jeopardized one criminal prosecution. The standard was a 10% error rate. There's no evidence in the record, at least that Mr. Burnett cites, that says it had to be over a 12-month period. The regulation, all the case law on PIPs from the MSPB, and several cases we've cited in our brief that this court affirmed, is that what's key is a reasonable opportunity over the course of a PIP, this was 73 days, to improve. In fact... Why was the PIP extended? It's not clear from the record, your honor. So I don't really know, the record doesn't say why it was extended, except to say that the agency wanted to give a little more time to improve. Other than that, there's no evidence as to exactly why. What about your friend's argument that, he doesn't quite make a distinct disparate treatment argument, but the notion that there were other colleagues that had error rates that went up and down through the year, but nobody confined them to a particular period of time and said, okay, because you missed the 10% cutoff for these particular months, you're out of here. His argument is basically more along the lines of comparator employees, and he argued today that their error rates were higher and nobody lost their job. At appendix 1023, there's a chart that the agency submitted in discovery to Mr. Burnett that sets out from October 08 to September 09, Mr. Burnett's record as well as the record of two of his peers, and it shows that Mr. Burnett's error rate was extremely high and was not improving, and it shows that the other two chemists that sometimes had a zero error rate, if they ever went over the 10%, they quickly came down in the next month to below 10%, and that's further corroborated by Ms. Chagy's declaration that when she canceled Mr. Burnett's peers, they quickly improved. So yes, once in a while they drifted above 10%, but then they went down to maybe 6% or 8% or lower, or no, 0% error rate in a particular month. So that there's a great deal of discretion and judgment afforded to an agency in setting performance standards, how they measure performance, how they evaluate, and in Mr. Burnett's PIP, he asked for a substantial percentage of the PIP for like two weeks of only marijuana exhibits, and Ms. Chagy did not agree to that, but she did agree to give him more than half of his exhibits during the PIP were the marijuana exhibits, which were far less complex than other controlled substances. Ms. Chagy's affidavit starts at Appendix 984, and it's very thorough in terms of the kind of feedback she gave. It's thorough in terms of the data. For example, in September 08, Mr. Burnett's tactical error rate was 18.3% for the prior year. In April 09, for the next six months, it climbed to 27.3%, and then in the PIP from November 09 to January 2010, the rate was more than 30%. So while his peers, once in a while, slipped above 10%, but immediately improved with the assistance that they got, Mr. Burnett's error rate continued to climb, even with substantial assistance from Ms. Chagy. She met with him weekly, she provided written summaries of exactly why his lab reports failed. The technical error rate on first submission pointed him to the manuals or the orders or whatever it was that he was required to follow, but he continued to make many of the same mistakes, particularly on weighing the controlled substances. And since, again, the standard is whether the agency gave him a reasonable opportunity, under the record here, given the facts and circumstances, the 73-day PIP was reasonable, and in terms of assistance, the record is replete with Ms. Chagy's efforts over more than two years to counsel him, mentor him, train him. She developed a refresher training module at one point to help him with the weighing problems that he was having, but his technical error rate kept climbing and he kept repeating many of the same errors that he had made earlier. Why was Burnett given a successful rating in 2008 when his error rate was closer to 20% than 10? Your Honor, that's because the 10% error rate was first set out for the GS-12s in November 2007. It was not mandatory at the time. In May of 2008, during that year, Director Olten said it would become mandatory for the next fiscal year, beginning on October 1st. So when you set out a rate and it's not mandatory, do you ignore it for purposes of a performance evaluation? You don't ignore it, but at that point, since it wasn't mandatory, it couldn't be the sole basis of the performance, and at the time that he got that successful performance evaluation, Ms. Chagy also warned him specifically in writing that the 10% technical error rate was mandatory and he had to improve his performance on that. So they gave him, he had the full year from October 1 of 2008 through September of 2009, and that's one of the first six months his rate went up to 27.3%. In the summer of 2009, Ms. Chagy determined that she would recommend a PIP, but under the agency procedures, headquarters in Washington had to approve it. So she put him on an informal type of PIP, in other words, continued to point out what mistakes he was making and why, citing the manuals and all that, and giving him assistance in trying to improve. So that was the long answer to your question as to why he got the successful performance evaluation, and why it wasn't going to be mandatory for that following year. So if there are no further questions, we respectfully request that the court adjourn the board. Thank you. Again, I believe, as we stand and sit here today, if we can't articulate what period of time the 10% applied, it then was not a firm benchmark toward which Mr. Burnett could direct or aim his performance. And in response to many of the questions that have come from the court, my submission is, again, that a reasonable opportunity to improve is, as the MSPB has said, as we quoted in our brief, the most important substantive right. So the fact that Mr. Burnett was very bad, the fact that his error rate was 20 or 30%, as opposed to 10.4 or 11.5%, does not justify his removal in this situation if the court decides that you can use the same one-year standard for a 73-day PIP. Thank you very much. Thank you, Mr. Tooks. The next case is Yong Xiu, BESPAC versus the United States.